# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SECURITIES INDUSTRY and FINANCIAL
MARKETS ASSOCIATION,

|                    |
|--------------------|

v.

JEFFREY B. GARFIELD, in his official
capacity as Executive Director and General
Counsel of the State Elections Enforcement
Commission, and RICHARD
BLUMENTHAL, in his official capacity as
Attorney General of the State of Connecticut,

CIVIL ACTION NO.
3:06cv2005 (SRU)

## MEMORANDUM OF DECISION

This dispute arises from the Connecticut State Elections Enforcement Commission's

("SEEC") efforts to enforce a campaign finance reform law that took effect on December 31,

2006.  The new law bans state contractors and "principals" of state contractors from contributing

to political candidates.  Although the plaintiff has challenged the contribution ban itself, the

instant motion for preliminary injunction challenges only an enforcement provision of the statute

that requires the SEEC to compile a master list of individuals to whom the statutory ban applies,

which includes the spouses and dependent children of state contractors' highest-ranking officers,

and requires the SEEC to publish the master list of those names on the state's Internet website.

The defendants in this case have argued that the plaintiff, the Securities Industry and Financial

Markets Association ("SIFMA"), does not have standing to challenge the statute, and that

SIFMA has not satisfied its burden of showing that the preliminary injunction standard has been

met.

On January 2, 2007 I held a hearing on SIFMA's motion for preliminary injunction.  At

the conclusion of the hearing, I orally ruled that SIFMA had associational standing to assert the

third-party constitutional claims of its members' employees, and that SIFMA had met the

preliminary injunction standard with regard to a portion of its Fourteenth Amendment privacy

claim.  The next day, I issued a written preliminary injunction order, which prohibited the

defendants from posting children's names on its Internet website.  I did not enjoin the defendants

from compiling a master list of individuals to whom the ban applies, including dependent

children, or from publishing the names of principals other than dependent children.  The

preliminary injunction order is attached as an appendix to this decision.  This memorandum of

decision expounds upon the oral decision issued on January 2nd, and provides a more complete

basis for issuing the written preliminary injunction order.

## I.      Background

Most of the facts in this case are undisputed.  On June 21, 2004, then Connecticut

Governor John G. Rowland resigned after he was accused of improperly accepting tens of

thousands of dollars of gifts and services from state contractors in exchange for the award of

state contracts.  On December 7, 2005, in the wake of Rowland's conviction for his participation

in the "pay-to-play" scandal, the Connecticut General Assembly passed a new campaign finance

reform law, Public Act 05-5 (the "Act").  The statute is unprecedented in scope.  A portion of the

law bans high-ranking officers of state contractors and their spouses and dependent children from

contributing to political candidates.  Conn. Gen. Stat. § 9-333n(g)(2).[1]  The statute also provides

---

[1] For purposes of the statute, a "'[p]rincipal of a state contractor or prospective state
contractor' means (i) an individual who is a member of the board of directors of, or has an
ownership interest in, a state contractor or prospective state contractor, which is a business entity,
except for an individual who (I) owns less than five per cent of the shares of any such state
contractor or prospective state contractor that is a publicly traded corporation, or (II) is a member
of the board of directors of a nonprofit organization . . . (ii) an individual who is employed by a
state contractor or prospective state contractor, which is a business entity, as president, treasurer

that Connecticut state agencies may void any existing state contracts executed after December 7, 2005 with any state contractor who does not comply with the contribution ban, and that "no state agency . . . shall award [a non-compliant] state contractor a state contract or an extension or an amendment to a state contract for one year after the election for which such contribution is made . . . ."  Conn. Gen. Stat. § 9-333n(g)(2)(C).

The Act defines "state contract" for purposes of the contribution ban as "an agreement or contract with the state or any state agency or any quasi-public agency, having a value of fifty thousand dollars or more, or a combination or series of such agreements or contracts having a value of one hundred thousand dollars or more in a fiscal year."  Conn. Gen. Stat. § 9-333n(g)(1)(C).  In its instructions for the completion of the "State Contractor Or Prospective State Contractor Affidavit," the SEEC defined "dependent child" as  "a qualifying child for whom a dependency exemption has been claimed by a principal on the last federal income tax form filed with the IRS."  SEEC Form SC 3A, Plaintiff's Ex. B.

The Act also contains a publication provision, which forms the basis of the instant dispute.  The provision requires the SEEC to:

> (A) compile a master list of principals of state contractors and prospective state contractors for all state agencies and quasi-public agencies . . . (B) publish the master list on the commission's Internet web site, and (C) provide copies of the master list to campaign treasurers upon request.

Conn. Gen. Stat. § 9-333n(h)(2).  At the hearing on the instant motion, the defendants presented

---

or executive or senior vice president, (iii) an individual who is the chief executive officer of a state contractor or prospective state contractor, which is not a business entity, (iv) an employee of any state contractor or prospective state contractor who has managerial or discretionary responsibilities with respect to a state contract, (v) the spouse or a dependent child of an individual described in this subparagraph, or (vi) a political committee established by or on behalf of an individual described in this subparagraph."  Conn. Gen. Stat. § 9-333n(g)(1)(F).

a mock-up of the proposed Internet disclosure of the master list.  Defendants' Ex. A1-A3.  The

master list is divided into three sub-lists.  List one provides the names of "Prospective State

Contractors who hold a valid Prequalification Certificate issued by the Commissioner of

Administrative Services,"  Defendants' Ex. A1; list two provides the names of "State Contractors

doing business with the Executive Branch of State Government,"  Defendants' Ex. A2; and list

three provides the names of "State Contractors doing business with the Legislative Branch of

State Government,"  Defendants' Ex. A3.  Each list has four columns that set forth the following

information: (1) last name; (2) first name; (3) middle initial; and (4) contractor/vendor name.

Defendants Ex. A1-A3.  The names of individuals banned from contributing are listed in

alphabetical order and are clearly linked to the contractor with which the banned contributor is

associated.  For example, the Doe family would be listed sequentially as Jane Doe, John Doe,

John Doe, Jr., and Susie Doe.  The list would link all of the Does' names, including the spouse

and dependent children, to Doe & Sons Financial, LLC.  The defendants had planned to post the

full list on the State of Connecticut's website without password-protecting the information.

SIFMA now challenges the statute's disclosure and publication requirement.  SIFMA is a

relatively new trade organization that was born out of the merger between the Securities Industry

Association and the Bond Market Association.  SIFMA represents the interests of various

business entities and has no individual members.  Multiple SIFMA member organizations,

including various municipal bond firms, are state contractors.  SIFMA's members have bid on,

executed, and performed state contracts with the State of Connecticut in the past, and plan to do

so in the future.

SIFMA's website provides that the organization "represents the industry which powers

the global economy. . . .  SIFMA is the single powerful voice for strengthening markets and

supporting investors -- the world over." *About SIFMA, The SIFMA Organization*,  *at*

http://www.sifma.org/section.cfm/about.  The website states that SIFMA's "dynamic, new

organization is passionately dedicated to representing more than 650 member firms of all sizes,

in all financial markets in the U.S. and around the world." *Id*.  Moreover, SIFMA is "committed

to enhancing the public's trust and confidence in the markets, delivering an efficient, enhanced

member network of access and forward-looking services, as well as premiere educational

resources for the professionals in our industry and the investors whom they serve." *Id*.  In short,

SIFMA is a trade organization that lobbies and otherwise advocates for the interests of its

members, many of whom are Connecticut state contractors.

 SIFMA argues that the disclosure and publication provision of the statute violates the

Fourteenth Amendment's substantive due process clause.[2]  SIFMA asserts that it will be likely to

succeed on the merits of its claim, and that its members' employees will suffer irreparable harm

by the disclosure and publication of their spouses' and dependent children's names.  The

---

[2] SIFMA also raises two other claims.  Neither of those claims, however, is addressed at length because neither is likely to succeed on the merits.  First, SIFMA brings a Fourteenth Amendment equal protection claim based upon the fact that the statute treats lobbyists and principals of state contractors differently.  Specifically, the statute requires the SEEC to collect and publish the names of the spouses and dependent children of state contractors' principals whereas the statute does not require the SEEC to collect and publish the names of lobbyists' spouses and dependent children, who face a similar contribution ban.  SIFMA's equal protection claim, however, is not likely to survive if its privacy claim does not survive, and SIFMA's privacy claim is stronger.  Second, SIFMA brings a First Amendment claim.  SIFMA argues that posting the spouses' and dependents' names on a list of banned contributors would "foster[] the erroneous assumption" that the spouse or dependent child "agrees with" the state contractor's positions on particular issues.  SIFMA's First Amendment associational claim is not likely to succeed on the merits because, among other reasons, the proposed list provides no information to indicate that any of the individuals agrees, or disagrees, with any particular position on an issue.

defendants argue that SIFMA is not likely to succeed on the merits, that SIFMA's members' employees will not be irreparably harmed, and that SIFMA does not have standing to assert claims on behalf of the non-member individuals.

## II.    Standing

The appropriate standard to apply to the standing analysis at the preliminary injunction stage is "analogous to that applied to a motion to dismiss for lack of standing."  *Fair Housing in Huntington Committee v. Town of Huntington*, 316 F.3d 357, 362 (2d Cir. 2003); *see also Building & Construction Trades Council of Buffalo v. Downtown Development, Inc.*, 448 F.3d 138, 144 (2d Cir. 2006).  Specifically, the court must "assume the truth of the facts alleged in plaintiffs' complaint, as well as those supplemented in plaintiffs' affidavits, and construe the complaint in their favor."  *Id*.

The "standing" doctrine is rooted in Article III's limit of judicial power to "cases" and "controversies," and has admittedly "not been defined with complete consistency."  *Valley Forge College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471 (1982).  The standing doctrine "subsumes a blend of constitutional requirements and prudential considerations . . . ."  *Id*.

Indeed, several "constitutional" requirements underlie the standing doctrine.  The doctrine assures the existence of "an actual factual setting in which the litigant asserts a claim of injury in fact" so the court "may decide the case with some confidence that its decision will not pave the way for lawsuits which have some, but not all, of the facts of the case actually decided by the court."  *Id*. at 472.  Moreover, standing "reflects a due regard for the autonomy of those persons likely to be most directly affected by a judicial order.  The federal courts have abjured

appeals to their authority which would convert the judicial process into no more than a vehicle for the vindication of the value interests of concerned bystanders." *Id*. at 473 (internal quotations omitted). If the federal courts were "merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding, the concept of 'standing' would be quite unnecessary." *Id*. The "cases and controversies" language of Article III, however, forecloses the conversion of courts of the United States into "judicial versions of college debating forums." *Id*. In addition, the requirement that a party seeking review must have standing also puts the decision about whether to seek legal redress "in the hands of those who have a direct stake in the outcome." *Id*. A federal court's "exercise of judicial power, which can so profoundly affect the lives, liberty, and property of those to whom it extends, is therefore restricted to litigants who can show 'injury in fact' resulting from the action which they seek to have the court adjudicate." *Id*.

Several "prudential" considerations also underlie the standing doctrine. A claimant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id*. Even when the plaintiff has alleged a redressable injury sufficient to meet the requirements of Article III, "the Court has refrained from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Id* (citation to internal quotation omitted). Additionally, the Court has required that the plaintiff's complaint fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id*.

Organizations may have standing in either of two ways. *Irish Lesbian & Gay Org. v.*

-7-

*Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998).  The organization may file suit on its own behalf "to

seek judicial relief from injury to itself and to vindicate whatever rights and immunities the

association itself may enjoy."  *Id*.  The organization may also "assert the rights of its members

under the doctrine of associational standing."  *Id*.

In this case, the latter applies.  The Supreme Court in *Hunt v. Washington State Apple*

*Advertising Commission*, 432 U.S. 333 (1977), articulated a test to determine whether an

association has standing to bring suit on behalf of its members.  According to the *Hunt* test, an

organization has associational standing when: "(a) its members would otherwise have standing to

sue in their own right; (b) the interests it seeks to protect are germane to the organization's

purpose; and (c) neither the claim asserted nor the relief requested requires the participation of

individual members in the lawsuit."  *Id*. at 343.  The first two prongs of the *Hunt* test are

constitutional in nature, whereas the third prong is prudential in nature. *United Food &*

*Commercial Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 557 (1996).

The *Hunt* Court also noted that "[w]hether an association has standing to invoke the

court's remedial powers on behalf of its members depends in substantial measure on the nature of

the relief sought."  *Hunt*, 432 U.S. at 343.  If the organization "seeks a declaration, injunction, or

some other form of prospective relief, it can reasonably be supposed that the remedy, if granted,

will inure to the benefit of those members of the association actually injured."  *Id*.

In this case, only the first prong of the *Hunt* analysis is seriously in dispute, specifically,

whether SIFMA's member organizations would have standing to sue in their own right.  SIFMA

does not argue that its members themselves have direct standing, but instead argues that its

members have third-party standing.[3]

To prove that SIFMA's members would have third-party standing, SIFMA must

establish: (1) that its members have suffered an injury in fact, thus giving those members a

sufficiently concrete interest in the outcome of the issue in dispute; (2) that its members have a

close relation to the third party; and (3) that there is some hindrance to the third party's ability to

protect his or her own interests.  *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991).

The defendants focus their standing argument upon their assertion that SIFMA's

members have not suffered an injury in fact.  The defendants acknowledge that the statute

penalizes SIFMA's member organizations for their principals' non-compliance with the

substantive contribution ban itself, and that the statute requires the SEEC to compile a master list

of banned individuals and to publish that list on the Internet and distribute it to campaign

treasurers upon request.  Nevertheless, the defendants argue that SIFMA's members have not,

and will not, suffer an injury in fact because the statute does not expressly require state

contractors to supply names to the SEEC or penalize the state contractors for their failure to

disclose the names of their principals and their principals' spouses and dependent children.  In

short, the defendants take the rather peculiar position that state contractors can simply ignore the

SEEC's attempts to enforce the disclosure and publication provision of the statute.

The defendants's assertion, however, is somewhat misleading.  The defendants

introduced a memorandum from the State of Connecticut Office of Policy and Management

---

[3] An organization's associational standing to assert third-party claims on behalf of its members is sometimes referred to as "derivative standing" or "stacking."  Derivative standing rests on the proposition that "an association may have standing to assert the claims of its members even where it has suffered no injury from the challenged activity."  *Hunt*, 432 U.S. at 342.

("OPM") Secretary, Robert L. Genuario, to the heads of executive branch state agencies entitled "New Contracting Requirements Pursuant to Conn. Gen. Stat. § 9-333n."  Defendants' Ex. B, p. 2.  In that memorandum, Genuario ordered all state agencies to include, "verbatim," certain "standard language" into "each new contract or amended contract."  *Id*.  The standard language includes the following requirements:

> (1)  Each agency must incorporate the new standard contract language concerning the ban on campaign contributions and solicitations into all new and amended contracts having a start date on or after December 31, 2006 . . . .
>
> (2)  Each agency must require current contractors and prospective contractors who submit proposals in response to a Request For Proposals (RFP) solicitation to:
>
> > (a)  complete a "State Contractor or Prospective State Contractor Affidavit" (SEEC Form SC 3) and return the form to the agency;
> >
> > (b)  complete a "List of Principals" form (SEEC Form SC 3A) and return the form to the SEEC . . . NOTE: The list must be updated if any change in principals occurs.
>
> (3)  If a state contractor or prospective state contractor fails to report and update its list of principals, the SEEC will notify the State agency in writing.  The State agency must then determine if the failure to report or update the list of principals constitutes a breach of contract.  If the agency so determines, the agency must follow the procedures described in the new standard contract language.

*Id*.

SEEC Form SC 3 is a form that the OPM has ordered state agencies to require current and prospective state contractors to complete when submitting a "request for proposal."  The form is an affidavit in which state contractors or prospective state contractors must certify that they "have listed each . . . principal in the attached page(s)" and submitted the list of principals,

including top employee's spouses and dependent children, to the SEEC.  Defendants' Ex. B.  The affidavit includes the following notice: "SWORN AS TRUE AND COMPLETE SUBJECT TO THE PENALTIES OF FALSE STATEMENT. . . .  ***Notice, Making a false statement on this form may subject you to criminal penalties, including, but not limited to, imprisonment, a fine, or both***."  *Id*. (emphasis in original).  The instructions to Form SC 3 also indicate that "**SEEC Form SC 3A, List of Principals, must be submitted to the SEEC**."  *Id*. (emphasis in original).

Therefore, at a minimum, a state contractor must sign an affidavit that indicates the contractor will provide the names of its top employees and their spouses and dependent children to the SEEC before it can be awarded a state contract.  The equation is simple: no affidavit, no state contracts.  If its employees refuse to comply with the statute's allegedly unconstitutional disclosure and publication provision, the state contractor is therefore left with the following options: (1) do not bid on or execute any state contracts that contain the new contractual language or that require SEEC Form SC 3; or (2) execute state contracts and affidavits and do not provide, and update, the names of principals, including spouses and dependent children, thus risking criminal penalties for making a false statement.  Under either of these scenarios, the state contractor would suffer an injury in fact that is both concrete and particular.

SIFMA's member organizations' injuries, in the form of lost state contracts, are also imminent.  At the hearing, SIFMA's witnesses testified that some of SIFMA's member organizations want to bid later this month on state contracts that include the new mandated contractual provisions.  Plaintiff's witnesses also testified that many of SIFMA's members' principals have not, and do not plan to, comply with the disclosure requirements regarding spouses and children.  Therefore, because their principals' noncompliance with the statute's

disclosure and publication provision will cause SIFMA's member organizations to lose state contracts, they will imminently suffer an injury, thus giving the organizations "a 'sufficiently concrete interest' in the outcome of the issue in dispute." *Hunt*, 432 U.S. at 343 (citation to internal quotation omitted).  SIFMA's member organizations thus have third-party standing to bring claims on behalf of their principals, and SIFMA, in turn, has associational standing to bring claims on behalf of its member organizations.

## III.   Preliminary Injunction

### A.   The Preliminary Injunction Standard

The fundamental purpose in granting a preliminary injunction is to preserve the court's ability to later render a meaningful final decision on the merits by preventing irreparable harm in the interim.  *See United States v. Adler's Creamery, Inc.*, 107 F.2d 987, 990 (2d Cir. 1939).  In general, to secure a preliminary injunction, the moving party must show that: (1) in the absence of a preliminary injunction the party will suffer irreparable harm; and (2) either "a likelihood of success on the merits" or "sufficiently serious questions going to the merits of the case to make it a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." *D.D. v. N.Y. City Board of Education*, 465 F.3d 503, 510 (2d Cir. 2006).  If the injunction, however, seeks to "prevent government action taken pursuant to statutory authority, which is presumed to be in the public interest," the "sufficiently serious questions" standard does not apply.  *Statharos v. New York City Taxi & Limousine Commission*, 198 F.3d 317, 321 (2d Cir. 1999).  In this case, SIFMA has moved for a prohibitory preliminary injunction "staying government action taken in the public interest pursuant to a statutory or regulatory scheme." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006).  Consequently, SIFMA must demonstrate that: (1) absent

injunctive relief, it will suffer irreparable injury, and (2) there is a likelihood that it will succeed

on the merits of its claims. *Id*. Additionally, "[w]henever a request for a preliminary injunction

implicates public interests, a court should give some consideration to the balance of such

interests in deciding whether a plaintiff's threatened irreparable injury and probability of success

on the merits warrants injunctive relief." *Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917,

929 (2d Cir. 1997).

       B.    <u>Likelihood of Success on the Merits</u>

To state a valid substantive due process claim, a party must first show that he has been

deprived of a fundamental right. Next, a party must show that the deprivation of that right was

unconstitutional. With regard to the latter, the Second Circuit has held that intermediate scrutiny

applies when the Fourteenth Amendment right to privacy is at issue. *See Statharos*, 198 F.3d at

323. Under intermediate scrutiny, if the disclosure rule is "designed to further a substantial

governmental interest and does not land very wide of any reasonable mark in making its

classifications, it must be upheld." *Bertoldi v. Wachtler*, 952 F.2d 656 (2d Cir. 1991); *see also

Eisenbud v. Suffolk County*, 841 F.2d 42, 46 (2d Cir. 1988). To determine whether a disclosure

regulation violates an individual's constitutional rights, courts must balance, in Justice Brandeis'

words, "the right to be let alone" against "the value of disclosure as a remedy for social and

industrial diseases." *Statharos*, 198 F.3d at 323.

       1.    *Privacy*

The Fourteenth Amendment extends to individuals a fundamental right to privacy. *See,

e.g., Whalen v. Roe*, 429 U.S. 589, 600 (1977). The exact nature and scope of the right to

privacy, however, has never been fully defined. *Barry v. New York,* 712 F.2d 1554, 1558 (2d

Cir. 1983).  In *Whalen*, the Supreme Court reasoned that the Fourteenth Amendment's privacy protection extends to "at least two different kinds" of privacy interests.  429 U.S. at 598-99. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions."  *Id*. at 599-600.  These interests have been characterized as "confidentiality" and "autonomy" respectively.  *Barry*, 712 F.2d at 1558-59.  With regard to the former, the Second Circuit has also consistently held that although the right to privacy is "one of the less easily delineated constitutional guarantees," it encompasses "the individual interest in avoiding disclosure of personal matters."  *Statharos*, 198 F.3d at 322.  Central to the instant motion is not whether individuals have a privacy interest in their own names, but whether the identity of one's child is a "personal matter."

The Second Circuit, on several occasions, has held that an individual has a privacy interest in certain personal matters.  For example, in *Barry* and its progeny, the Second Circuit held that individuals have a fundamental right to privacy in their personal financial information. In *Doe v. City of New York*, 15 F.3d 264 (2d Cir. 1994), the Second Circuit acknowledged that the analysis in *Barry* and its progeny extends beyond personal financial information.[4]  *Id*. at 267. The "right to confidentiality was recognized in both *Barry* and *Eisenbud* in the context of financial disclosures, but the analysis employed in both is appropriate for the evaluation of a violation of a right to confidentiality regarding other types of personal information."  *Id*.  In determining that individuals infected with HIV clearly possess a constitutional right to privacy

---

[4] These cases exclusively considered employees' privacy interests in their own financial information.  Several cases, however, at least strongly implied that employees have a privacy interest in information about their immediate family.  *See Bertoldi v. Wachtler*, 952 F.2d 656, 658 (2d Cir. 1991); *Igneri v. Moore*, 898 F.2d 870, 877 (2d Cir. 1990).

regarding their condition," the Second Circuit in *Doe v. City of New York* reasoned that the "[e]xtension of the right to confidentiality to personal medical information recognizes there are few matters that are quite so personal as the status of one's health, and few matters the dissemination of which one would prefer to maintain greater control over." *Id*. The court continued, "[a]n individual revealing that she is HIV seropositive potentially exposes herself not to understanding or compassion but to discrimination and intolerance, further necessitating the extension of the right to confidentiality over such information." *Id*. Thus, "personal information," in the constitutional sense, is information about an individual that, if widely known, would reasonably cause that individual embarrassment, discomfort, or concern.[5]

Most parents would, at a minimum, be uncomfortable and quite concerned about the state posting their child's name, familial association, and connection to the parents' business on the Internet. The Internet has revolutionized the scope and manner in which information is available for public access. The Internet has also, unfortunately, provided criminals with a new medium through which to commit crimes.[6] SIFMA's expert commented that criminals who exploit victims over the Internet commit their crimes by connecting various pieces of information from multiple different sources. Each piece of information, by itself, may not provide the criminal

---

[5] Commentators have observed that "personal information" can be defined as either "information identifiable to the individual" or information "especially sensitive, private, or embarrassing." Jerry Kang, *Information Privacy in Cyberspace Transactions*, 50 Stan. L. Rev. 1193, 1205 (1998). The identity of one's children satisfies both definitions.

[6] The Federal Bureau of Investigation's ("FBI") "Parent's Guide to Internet Safety" provides that "Our children are . . . the most vulnerable members of society. . . . Unfortunately the same advances in computer and telecommunication technology that allow our children to reach out to new sources of knowledge and cultural experiences are also leaving them vulnerable to exploitation and harm by computer-sex offenders." FBI, "A Parent's Guide to Internet Safety," Plaintiff's Ex. 24.

with enough information to exploit the victim.  With only a child's name, however, a criminal

can very easily obtain enough personal information to exploit the child, including the child's

home address, e-mail address, phone number, and the like.[7]  With little effect, a criminal can

gather enough information to exploit the child.  Posting a child's name and familial information

online does not guarantee that an online predator will perpetrate a crime against the child.  The

state's master list, however, by providing criminals with a key piece of information, will

undoubtedly increase a child's *risk* of victimization.

　　　　The law has traditionally recognized that parents are uniquely situated to raise their

children, which necessarily entails protecting their children from certain risks.  *Cf. Pierce v.*

*Society of Sisters,* 268 U.S. 510, 534-35 (1925) (the "liberty of parents and guardians" includes

the right "to direct the upbringing and education of children under their control. . . . [T]he child is

not the mere creature of the State; those who nurture him and direct his destiny have the right,

coupled with the high duty, to recognize and prepare him for additional obligations"); *United*

*States v. Myers*, 426 F.3d 117, 125 (2d Cir. 2005) ("the fundamental right of parents to make

decisions concerning the care, custody, and control of their children [is] perhaps the oldest of the

fundamental liberty interests recognized by" the Supreme Court); *Wilkinson v. Russell*, 182 F.3d

89, 104 (2d Cir. 1999) ("parents enjoy a constitutionally protected interest in their family

integrity"); *Fay v. South Colonie Central School District*, 802 F.2d 21, 26 (2d Cir. 1986) ("a

parent has a fundamental interest in his child's upbringing").  For example, parents are

---

　　　　[7] The FBI's Parent's Guide to Internet Safety also addresses what parents can do "to
minimize the chances of an on-line exploiter victimizing your child."  Plaintiff's Ex. 24.  One
such method is "*to never give out identifying information such as [their child's] name. . . .*"  *Id.*
(emphasis added).  The plaintiffs have submitted several other Internet safety guides that provide
the same advice.

responsible for their child wearing a seatbelt in a car and taking their child to the doctor when he becomes ill.  Parents must decide whether to allow their child to play football or participate in a school field-trip.  The extent to which a child's name is disclosed and publicly disseminated on the Internet is another risk over which parents maintain responsibility and control.

Moreover, the notion that parents should maintain control over the disclosure and pubic dissemination of their children's names is not novel.  In April 2000, the Federal Trade Commission ("FTC") issued the Children's Online Privacy Protection Rule in response the Children's Online Privacy Protection Act, 15 U.S.C. § 6501, *et seq*.  The rule applies to operators of commercial websites and online services that collect personal information from children.  The Rule requires that the website operators "post privacy policies, provide parental notice, and get verifiable consent from a parent or guardian before collecting personal information from children."  *See The Children's Online Privacy Protection Rule: Not Just for Kids' Sites*, *at* http://www.ftc.gov/bcp/conline/pubs/alerts/coppabizalrt.pdf.  The rule also requires operators to "give parents a choice as to whether their child's personal information will be disclosed to third parties" and "provide parents access to their child's personal information and the opportunity to delete the child's personal information and opt-out of future collection or use of the information."  Plaintiff's Ex. 26.

In addition, courts have acknowledged that, in the context of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, parents have a privacy interest in the public dissemination of their child's identity.  The FOIA "was enacted to facilitate public access to Government documents."  *United States Department of State v. Ray*, 502 U.S. 164, 173 (1991).  "The statute was designed 'to pierce the veil of administrative secrecy and to open agency action to the light of public

scrutiny.'" *Id*.  The FOIA, however, expressly provides for a redaction procedure because

"Congress . . . recognized that the policy of informing the public about the operation of its

Government can be adequately served in some cases without unnecessarily compromising

individual interests in privacy."[8]  *Id*. at 174.  In considering whether to redact an individual's

name from a government document, the Supreme Court has found particularly persuasive

whether or not the disclosure of the individual's identity would reveal other "highly personal

information regarding marital and employment status, [or] children . . . ."  *Id*. at 175.  The Court

continued that "although disclosure of such personal information constitutes only a *de minimis*

invasion of privacy when the identities of the [individuals] are unknown, the invasion of privacy

becomes significant when the personal information is linked to particular [individuals]."  *Id*. at

176.

I thus conclude that parents have a fundamental privacy interest in the identities of their

children.  The scope of that right, however, is certainly not absolute.  The state can doubtless

compel parents to disclose their child's name in a variety of circumstances.  For example, a local

school board of education can compel parents to disclose the names of their children enrolled in

school and not run afoul of the Fourteenth Amendment.  Similarly, the SEEC can require state

contractors to divulge the names of their top employees' dependent children in furtherance of the

substantial government interests discussed below.  The state, however, may not require parents to

divulge the identities of their children without any cause whatsoever, nor may it disclose those

names to the public over the Internet absent parental consent or exceptional circumstances.

---

[8] "Exemption 6" protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).

Although one's spouse's name is personal information, there is a much weaker privacy claim with respect to spouses names than with respect to children's names.  The concerns that parents reasonably have about disclosing their child's identity simply do not typically exist with regard to spouses.  Spouses' identities are a matter of public record, for example, in motor vehicle records and property tax records.  Moreover, children are much more vulnerable than adults, so disclosure of a spouse's name does not typically give rise to the same concerns and discomfort as does disclosure of a child's name.

### 2. *Government Interest*

Parents' confidentiality interests in the identity of their children can be overcome by a sufficiently weighty government purpose.  *See Statharos*, 198 F.3d at 323.  In cases that involve an individual's Fourteenth Amendment privacy interest, courts apply intermediate scrutiny, which requires the government to identify a "substantial interest" furthered by the challenged law.  Courts have used a variety of approaches in identifying the state interest sought to be advanced by a challenged statute.  Courts have "sometimes accepted the state interest identified by counsel for the state during the litigation," or "the interest identified by witnesses for the state during the litigation," or "the interest identified by a state court reviewing the challenged requirement."  *Bertoldi*, 952 F.2d at 659.  In fact, "the Court has been willing to apply intermediate scrutiny to state interests that only might arguably be advanced by the challenged requirement."  *Id*.

The statute, as a whole, promotes several substantial state interests, especially considering recent events in this state's history.  The statute seeks to restore public confidence in the integrity of state government and to eliminate corruption and undue influence flowing from campaign

contributions given or solicited by certain special interests.  The law also seeks to eliminate the appearance of corruption flowing from such contributions and to promote transparency in campaign financing and state contracting.  Finally, the law attempts to respond to documented instances of corrupt dealings between state contractors, their immediate family members, and officials at the highest levels of state government.  The contribution ban extends to spouses and children as a prophylactic measure to prevent state contractors from circumventing the statute by using their immediate family as a conduit.  The Second Circuit has already found these and similar interests further "a substantial, possibly even a compelling, state interest."  *Kaplan v. Board of Education*, 759 F.2d 256, 261 (2d Cir. 1985).

The constitutionality of the law, as a whole, however, is not yet at issue.  Instead, only the disclosure and publication provision is challenged by the present motion.  The state also has several interests in compiling and publishing the names of individuals banned from making political contributions.  First, the provision will assist candidates, officeholders and political committees to comply with the contribution ban.  Second, the provision will assist the SEEC and other state agencies to enforce the contribution ban.  Third, the provision will facilitate grassroots public oversight and will restore the public confidence in the SEEC's enforcement of the ban.  The disclosure provision itself is thus an enforcement mechanism for the contribution ban.  Each of those interests is substantial.

3.     *Tailoring*

The disclosure provision that requires dependent children's names to be posted on the Internet nevertheless lands "wide of the mark" because the method of publication, as opposed to the scope of persons included, is too broad.  At the outset, it is crucial to distinguish parents'

-20-

disclosure of their children's names to a state agency from the state agency's public dissemination of those names.  In *Barry*, the Second Circuit illustrated the distinction between collection and publication.  "The adverse effect of public disclosure on privacy interests is considerably greater than the effect of disclosure to" the government.  *Barry*, 712 F.2d at 1561.  The *Barry* Court continued, "the degree of intrusion stemming from public exposure of the details of a person's life is exponentially greater than disclosure to government officials."  *Id*.  In this case, the disclosure and publication provision runs afoul of the Fourteenth Amendment only because the scope of public dissemination is excessive.

The Second Circuit has consistently recognized that, under intermediate scrutiny, statutes that require parties to disclose sensitive personal information must have reasonable limitations on the dissemination of that information.  For example, in *Barry*, *Eisenbud, Igneri*, *Bertoldi* and *Statharos*, the Second Circuit held that certain publicly and privately employed individuals had a fundamental privacy interest in the public disclosure of their financial information.  Although the Courts upheld all of the disclosure provisions at issue in those cases, virtually all of the challenged statutes either did not require the employees to identify or provide any information about their spouses or children, or provided a mechanism to restrict the release of that information to certain individuals, or both.  *Barry*, 712 F.2d at 1562 ("a filing employee may specify that he does not want information released to particular persons or groups, and . . . the Board of Ethics may deny an inspection request if the Board has reason to believe that the person or organization making the request is not acting in good faith or is attempting to obtain the information for some inappropriate or improper purpose."); *Eisenbud*, 841 F.2d at 47 ("the same type of mechanism approved in *Barry* for allowing the employee to forestall disclosure to

inquiring individuals in certain circumstances is provided to the County employees.  Indeed, the

procedural safeguards provided by the Disclosure Board appear to go beyond what was thought

to suffice in Barry . . . ."); *Igneri*, 898 F.2d at 877 ("[w]e are further persuaded that the statute

presents no constitutional infirmities because of the extensive protection it provides to those

officials who prefer, for valid reasons, that their disclosed information not be made public. . . .

More important, the statute allows for exceptions and, in the case of spouses and unemancipated

children, for exemptions, for information having no material bearing on the reporting person's

duties and posing little danger of conflict of interest."); *Bertoldi*, 952 F.2d at 658 ("an employee

may apply for and obtain an exemption for disclosure of information pertaining to the employee's

spouse or children, if the Commission finds that the information has no material bearing on the

discharge of the reporting person's official duties."); *Statharos*, 198 F.3d at 326-27 ("[a]fter oral

argument, the Commission informed us that it plans to adopt written standards governing its

review of FOIL requests for medallion owners' financial disclosure forms.  Under these

standards, private financial information in the Forms would not be released. . . .  In the event that

the Commission adopts guidelines for release of personal financial information that are less

protective than those upheld in *Barry* and its progeny, plaintiffs are free to renew their facial

challenge to the Rule.").  In this case, the statute contains no similar limitations.  To the contrary,

the statute gives no exemption for children's names and actually requires worldwide

dissemination of that information.

Publishing dependent children's names on the state's Internet website is not necessary to

further the state's legitimate interests.  Publishing dependent children's names on a publically

available Internet website, as opposed to distributing the master list only to state campaign

treasurers and state enforcement agencies, will not further assist political candidates in

conforming to the ban, nor will it substantially further assist state agencies to enforce the ban.  A

more limited distribution of the master list, or password-protecting the master list, would provide

the same assistance in complying with and enforcing the ban.

It is a significantly closer question whether Internet publication of the children's names

will, through facilitating public oversight, restore public confidence in Connecticut's

government.  The defendants assert that the publication of children's names will reassure the

public that state contractors are not using their dependent children to circumvent the statute.

Public disclosure of dependent children's names, however, would not significantly add to the

public's oversight of the campaign finance system for several reasons.  First, top employees of

state contractors, to whom the ban most directly applies, and their spouses, can still be listed on

the SEEC's website.  The ban on contributions from dependent children is simply a prophylactic

measure to enforce the ban on contributions from principals of state contractors themselves.

Second, including dependent children in the master list will do little or nothing to assure

the public that state contractors are not using their children to circumvent the disclosure and

publication provision, and the statute as a whole.  In order to avoid disclosing one's child to the

SEEC, and to avoid the prophylactic ban altogether, the top employees of state contractors need

only elect not to claim their children as dependents on their tax returns.  Indeed, many already do

not.  There are various reasons why parents might not claim their children as dependents for tax

purposes.  For example, it may not be financially advantageous for the parents to do so; the value

of the exemption decreases with income and eventually disappears.  The child may make too

much money himself.  The parents might be divorced and may not have joint custody of the

child.  There is a common thread running through these reasons: not one of them has any relevance to whether or not a parent is more or less likely to use the child as a conduit to circumvent disclosure rules.[9]

Third, the statute's disparate treatment of lobbyists is instructive.  The statute contains a sweeping provision that bans lobbyists and their immediate family members from contributing to political candidates.  The lobbyist contribution ban reflects the view that donations from lobbyists and their families, like those from principals of state contractors, may have a corrupting influence, and thus, the government has a substantial interest in ensuring that lobbyists comply with the ban.  Under the existing statute, however, the SEEC is not required to disclose lobbyists' dependent children on the Internet; the statute only requires disclosure of the lobbyists' dependents if they, in fact, make a political contribution.  It thus appears that the state's goals can be accomplished without massive distribution of the master list.

In short, this case presents a situation in which parents' substantial privacy interest in the identities of their children must be weighed against the state's substantial interest in promoting public confidence and honest government.  Because the measure is not sufficiently tailored to achieve the interests that the statute seeks to advance, I conclude that SIFMA is likely to succeed on the merits of its Fourteenth Amendment privacy claim.

C.    Irreparable Harm

"Irreparable harm" is defined as "certain and imminent harm for which a monetary award

---

[9] One of the defendants in this case, Jeffrey Garfield, testified that the commission chose to define dependents with reference to the tax status of the child in order to provide a "bright line" rule.  It is unclear why other lines, such as "all children under the age of eighteen" or "all children who are eligible to be claimed as dependents," would be any less bright.

does not adequately compensate." *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003). "Thus, only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief." *Id.* at 113-14. In this case, SIFMA and its member organizations will not be irreparably harmed in the absence of an injunction because the loss of state contracts is compensable. For the reasons discussed above, however, SIFMA has derivative standing to raise claims on behalf its members' top employees, who will certainly be irreparably harmed in the absence of a preliminary injunction.

The employee principals will be irreparably harmed because "[t]he harm at issue here – disclosure of confidential information – is the quintessential type of irreparable harm that cannot be compensated or undone by money damages." *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *See Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (citing 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948, at 440 (1st ed. 1973)). Moreover, SIFMA's computer expert testified that once the children's names are disclosed on the Internet, the information will be indexed by search engines and widely distributed and archived by various Internet companies, so that it cannot be retrieved. Finally, SIFMA has shown that the harm is imminent because the state has already posted the names of top employees of state contractors and their spouses, and had planned to post the dependent children's names as well in the absence of a preliminary injunction. SIFMA has thus made a showing that, in the absence of an injunction, its members' employee-principals will suffer "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co., L.L.C.*, 339 F.3d at 113.

**IV.     Conclusion**

    After reviewing all the evidence, I conclude that SIFMA has associational standing to raise its member organizations' third-party claims, and that SIFMA is likely to succeed on its Fourteenth Amendment privacy interest claims with respect to dependent children.

    Accordingly, SIFMA's motion for preliminary injunction **(doc. #6)** is hereby **GRANTED** in part and **DENIED** in part.  The defendants are hereby preliminarily enjoined in accordance with the terms of the January 3, 2007 preliminary injunction order, which is attached hereto as Appendix A.

    It is so ordered

    Dated at Bridgeport, Connecticut, this 9th day of January 2007.


                        /s/ Stefan R. Underhill
                            Stefan R. Underhill
                            United States District Judge

## APPENDIX A

## PRELIMINARY INJUNCTION ORDER

Plaintiff Securities Industry and Financial Markets Association ("SIFMA") has moved for a preliminary injunction to restrain enforcement of certain Connecticut statutes, which were enacted in December 2005 as part of An Act Concerning Comprehensive Campaign Finance Reform for State-Wide Constitutional and General Assembly Offices, Pub. Act No. 05-5 (Dec. 7, 2005), and amended by An Act Concerning the Campaign Finance Reform Legislation and Certain Election Law and Ethics Provisions, Pub. Act No. 06-137 (June 6, 2006) (the "Act"). See Conn. Gen. Stat. §§ 9-333a, et seq.  Specifically, Plaintiff requests that the Court preliminarily enjoin enforcement of the provision of the Act that requires the collection, disclosure and publication on the Internet of the identities of spouses and dependent children of certain directors, officers and employees of state contractors and prospective state contractors. Conn. Gen. Stat. § 9-333n(h)(2).

On January 2, 2007, I conducted a hearing on that motion.  At that hearing, Plaintiff established that: (1) in the absence of an injunction, its member firms will suffer irreparable harm; (2) there is a likelihood of success on the merits of one of its constitutional claims; and (3) the balance of hardships decidedly tips in Plaintiff's favor with respect to that claim, but not with respect to its other claims.

Accordingly, pursuant to Rule 65 of the Federal Rules of Civil Procedure, it is hereby ORDERED that defendants Jeffrey B. Garfield (in his official capacity as Executive Director and General Counsel of the State Elections Enforcement Commission) and Richard Blumenthal (in

his official capacity as Attorney General of the State of Connecticut) are hereby preliminarily enjoined and prohibited from taking any action to publicly disclose, including by posting on the Internet pursuant to Conn. Gen. Stat. § 9-333n(h)(2)(B), the names of those individuals who are defined as principals solely because they are dependent children of a director, executive or employee who is defined as a principal of a state contractor or prospective state contractor pursuant to Conn. Gen. Stat. § 9-333n(g)(1)(F).

This order does not affect the enforceability of other provisions of the Act, including the provisions requiring the public disclosure of the names of principal executives of state contractors, prospective state contractors, and their spouses.  This order does not preclude the defendants from publicly disclosing the names of dependent children who actually make contributions in violation of Conn. Gen. Stat. §§ 9-333g, et seq.  In addition, this order does not preclude the defendants or the State of Connecticut from requiring state contractors and principal executives of state contractors to disclose the names of their spouses and dependent children to the State Elections Enforcement Commission.  Finally, this order does not preclude the defendants or State Elections Enforcement Commission from: (1) compiling a master list of all individuals to whom the contribution ban in Conn. Gen. Stat. §§ 9-333g, et seq. applies, including spouses and dependent children, pursuant to Conn. Gen. Stat. § 9-333n(h)(2)(A); and (2) distributing copies of the master list to state agencies charged with enforcement of the Act and to campaign treasurers upon request pursuant to Conn. Gen. Stat. § 9-333n(h)(2)(C); provided, however, that when distributing the master list, or any part thereof, the State Elections Enforcement Commission shall include with the distribution a copy of this order.

This order is binding on the two named defendants, their officers, agents, servants,

-28-

employees and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

The preliminary injunction is issued without a bond and shall remain in effect until a ruling on the merits of Plaintiff's claims or further order of this court.

It is so ordered

Dated at Bridgeport, Connecticut, this 3rd day of January 2007.